UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LISA A. FRAZIER, | |
| Plaintiff, | Case No. 1:22-cv-00043 |
| v. | Judge William L. Campbell, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

To:     The Honorable William L. Campbell, District Judge

## REPORT AND RECOMMENDATION

Plaintiff Lisa A. Frazier filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, and for supplemental security income (SSI) under Title XVI of the Social Security Act, *id.* §§ 1381–1383f.[1] (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 4.) Frazier has filed a motion for judgment on the administrative record (Doc. No. 10), to which the Commissioner has responded in opposition (Doc. No. 12), and Frazier has filed a reply (Doc. No. 15). Having considered the parties' arguments and the administrative record (Doc. No. 8) as a whole, the Magistrate Judge will recommend that the Court

---

[1]     Martin O'Malley was sworn in as Commissioner of the Social Security Administration on December 20, 2023. Social Security Administration, *Commissioner Martin O'Malley*, https://perma.cc/7L76-L7NR. Under Federal Rule of Civil Procedure 25(d), O'Malley is automatically substituted as a defendant in place of former Acting Commissioner Kilolo Kijakazi. *See* Fed. R. Civ. P. 25(d).

deny Frazier's motion for judgment on the administrative record and affirm the Commissioner's decision.

## I.    Background

### A.    Frazier's DIB and SSI Applications

Frazier applied for DIB and SSI on July 1, 2019, stating that she has been disabled and unable to work since June 5, 2019, due to hypertension, obesity, gastroesophageal reflux disease (GERD), depression, restless leg syndrome, cerebral small vessel disease, fatty liver disease, moderate to severe sleep apnea, periodic limb movement disorder, and a carcinoid tumor on her appendix. (AR 80–81, 99–100.[2]) The Commissioner denied Frazier's applications initially and on reconsideration. (AR 118–19, 176–77.) At Frazier's request, an administrative law judge (ALJ) held a telephonic hearing regarding her applications on August 31, 2021. (AR 51–79, 179–80.) Frazier appeared with an attorney and testified. (AR 53, 55–73.) The ALJ also heard testimony from a vocational expert. (AR 73–79.)

### B.    The ALJ's Findings

On October 1, 2021, the ALJ issued a written decision finding that Frazier was not disabled within the meaning of the Social Security Act and applicable regulations and denying her claims for DIB and SSI. (AR 30–43.) The ALJ made the following enumerated findings:

> 1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.
>
> 2.    The claimant has not engaged in substantial gainful activity since June 5, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.    The claimant has the following severe impairment: osteoarthritis (knees), degenerative joint disease (shoulders), degenerative disc disease/spondylosis

---

[2]    The transcript of the administrative record (Doc. No. 8) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

(lumbar and cervical spine[ ], mild), morbid obesity, obstructive sleep apnea, depression, anxiety, and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

\*     \*     \*

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*     \*     \*

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) that is limited to: lifting and carrying up to twenty pounds occasionally, and up to ten pounds frequently; standing/walking up to or about 6 hours, and sitting up to or about 6 hours in 8-hour workdays with normal breaks; frequent pushing and pulling with the bilateral upper extremities; occasional climbing stairs/ramps, balancing, stooping, kneeling, and crouching; no crawling or climbing ladders, ropes or scaffolds; frequent overhead reaching with the bilateral upper extremities; and avoidance of concentrated exposure to extremely hot or cold temperatures and vibrations. Mentally, she can maintain concentration, persistence, and pace for three step tasks; can have infrequent interaction or contact with the general public; can have occasional, superficial interaction with coworkers; and she can adapt to occasional workplace changes.

\*     \*     \*

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*     \*     \*

7.     The claimant was born on April 30, 1972[,] and was 47 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

*    *    *

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 32–43.)

The Social Security Appeals Council denied Frazier's request for review on September 7, 2022, making the ALJ's decision the final decision of the Commissioner. (AR 1–6.)

### C.    Appeal Under 42 U.S.C. §§ 405(g) and 1383(c)(3)

Frazier filed this action for review on October 24, 2022 (Doc. No. 1), and this Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Frazier argues that the Court should vacate the ALJ's decision and remand her applications to the SSA for rehearing because the ALJ: (1) failed to account for Frazier's severe shoulder and sleep apnea impairments in formulating Frazier's residual functional capacity; (2) improperly analyzed opinion evidence from Frazier's daughter who is a nurse, a consulting chiropractor who examined Frazier in 2021, and a consulting doctor who examined Frazier in 2014; and (3) improperly analyzed Frazier's testimony about her disabling symptoms. (Doc. No. 10.) The Commissioner argues that the ALJ complied with SSA regulations and that the ALJ's determinations are supported by substantial record evidence. (Doc. No. 12.) Frazier filed a reply reiterating her arguments about the ALJ's consideration of her shoulder and sleep apnea impairments, the consulting chiropractor's opinion, and her testimony. (Doc. No. 15.)

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

## B. Determining Disability at the Administrative Level

DIB and SSI benefits are available to individuals who are disabled, which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (explaining that this definition applies in the DIB and SSI contexts).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). For purposes of this case, the regulations governing disability determination for DIB and SSI benefits are identical. *See Colvin*, 475 F.3d at 730 (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the ALJ considers the claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four.

6

*Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.    Analysis

### A.    The ALJ's Consideration of Frazier's Sleep Apnea and Shoulder Impairments in Formulating Her RFC

Frazier argues that the ALJ's RFC lacks the support of substantial record evidence because the ALJ did not include any limitations to address Frazier's obstructive sleep apnea and degenerative shoulder joint disease despite determining at step two that these impairments are severe. (Doc. No. 10.) Frazier argues that "[i]t is axiomatic that the Residual Functional Capacity ('RFC') should include some limitation to account for an impairment that an ALJ has found to be severe" (*id.* at PageID# 1290) because "[f]inding an impairment to be severe but then failing to account for it in the RFC creates an internal inconsistency in the ALJ's decision" (Doc. No. 15, PageID# 1344). While Frazier's argument has some logical appeal, the Sixth Circuit has expressly rejected her reasoning. *See, e.g.*, *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 427–28 (6th Cir. 2007) (rejecting claimant's argument "that the ALJ's analysis was internally inconsistent because he classified [the claimant's] [depression] as 'severe' but . . . determined that [the claimant's] depression had only a minimal effect on his ability to concentrate"). In *Griffeth*, the Sixth Circuit explained that the severity determination at step two is "a '*de minimis* hurdle' in the disability determination process" that "enable[s] the Commissioner to screen out 'totally groundless claims.'" 217 F. App'x at 428 (first quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); and then quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). Thus, "'[a] claimant's severe impairment may or may not affect his or her functional capacity to do work'" and "'[o]ne does not necessarily establish the other.'" *Id.* at 429 (quoting *Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)); *see also Khudiar v. Colvin*, No. 3:15-cv-00408, 2015 WL 10774836, at *5 (M.D. Tenn. Oct. 8, 2015) ("Determining the claimant's RFC is distinct from assessing whether the claimant has a

severe impairment at step two of the disability analysis."), *report and recommendation adopted*, 2016 WL 1755988 (M.D. Tenn. May 3, 2016); *Bratton v. Astrue*, No. 2:06-0075, 2010 WL 2901858, at *21 (M.D. Tenn. Jan. 26, 2010) ("A step two determination that an individual has a severe impairment '"may or may not affect [that individual's] functional capacity to do work. One does not necessarily establish the other."'" (alterations in original) (quoting *Markel v. Comm'r of Soc. Sec.*, No. 08-14407, 2009 WL 3271191, at *9 (E.D. Mich. Oct. 13, 2009))), *report and recommendation adopted*, 2010 WL 2901856 (M.D. Tenn. July 19, 2010). For this reason, SSA "regulations recognize that individuals who have the same severe impairment may have different RFCs depending on their other impairments, pain, and other symptoms." *Griffeth*, 217 F. App'x at 429.

Contrary to Frazier's argument, the ALJ's determination that Frazier's obstructive sleep apnea and degenerative shoulder joint disease are severe impairments does not automatically trigger an obligation to incorporate limitations addressing those impairments into Frazier's RFC. Instead, SSA regulations require the ALJ to make an independent determination of the limiting effects of all of Frazier's impairments in determining her RFC, including those that are not severe. 20 C.F.R. §§ 404.1545(a)(2), (e), 416.945(a)(2), (e); *see also* SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). The Court must therefore determine whether the ALJ's consideration of the limiting effects of Frazier's sleep apnea and degenerative shoulder joint disease in formulating her RFC is supported by substantial record evidence.

### 1.    Sleep Apnea

Frazier argues that the ALJ's "failure to consider [her] severe impairment of sleep apnea was error in this case, which also was not harmless" because her attorney representative asked the

vocational expert "about the jobs someone could do if they were off task more than 15 percent of the day—something one might expect of a person who falls asleep during the day or is drowsy and has trouble concentrating—and the" vocational expert responded that "such a person would be unable to engage in competitive employment." (Doc. No. 10, PageID# 1292.)

In his analysis of Frazier's sleep apnea, the ALJ found that, "[i]n December 2017, [Frazier] underwent a sleep study and was diagnosed with moderate obstructive sleep apnea, severe in the supine position, and CPAP therapy was recommended." (AR 37 (citation omitted).) In addressing Frazier's medical records from 2019 through 2021, the ALJ noted that November 2020 medical records from Maury Regional Prime Care Clinic "showed the ongoing treatment impression including . . . moderate obstructive sleep apnea[.]" (AR 37.) The ALJ also considered evidence that Frazier's "mental impairments," including PTSD, "cause her to experience . . . sleep disturbances" (AR 39) and evidence that Frazier "takes several medications which allegedly cause fatigue" (AR 40). Ultimately, the ALJ concluded:

> In sum, the claimant's allegations regarding the nature and severity of [her] impairment-related symptoms and functional limitations are partially consistent with the evidence for the relevant period in question. While the medical and other evidence of record supports some of the allegations regarding these symptoms, the alleged severity and associated functional restrictions are not well supported. The undersigned has carefully read and considered all the evidence of record and finds the residual functional capacity set forth above is more consistent with the appropriate medical findings and the overall evidence of record than the allegations made by the claimant.

(AR 41.)

Although the ALJ's consideration of Frazier's sleep apnea was brief, Frazier has not shown that the ALJ's analysis and ultimate RFC determination regarding any limitations imposed by her sleep apnea lack the support of substantial record evidence. The Maury Regional Prime Care Clinic medical records that the ALJ cites confirm that, on November 4, 2020, Frazier's medical providers found that her "[m]oderate obstructive sleep apnea" was "[s]table" despite the fact that she did

"not have [a] CPAP due to [her lack of] insurance." (AR 1149, 1150.) Frazier points to a function report she completed in July 2019 in connection with her DIB and SSI applications stating that she has "difficulty falling asleep and staying asleep" and "stay[s] tired all the time" because of her "moderate to severe obstructive sleep apnea[.]" (AR 333.) However, in her administrative hearing testimony, Frazier characterized her fatigue as a symptom of her anxiety and depression and a side effect of her medications; she did not mention her sleep apnea or identify it as a cause of her fatigue or inability to concentrate. (AR 70–72.) And the existence of some evidence in the record to support greater sleep-apnea-related restrictions in Frazier's RFC is not a basis for remand. This Court must defer to an ALJ's finding that is supported by substantial evidence "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also id.* ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." (alteration in original) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Frazier cites four cases to support the general proposition that "[c]ourts routinely remand cases due to the ALJ's failure to account for a severe impairment of sleep apnea in the RFC" (Doc. No. 10, PageID# 1291–92), but each case she cites is distinguishable from her own. In *Wilcox v. Commissioner of Social Security*, the district court found that, among several other errors, the ALJ's discussion of the claimant's impairments at step three was "entirely devoid of any reference to sleep apnea even though this condition was one of the specific ailments prompting [the claimant's] benefits application." Civ. Action No. 13-CV-12549, 2014 WL 4109921, at *4 (E.D. Mich. Aug. 19, 2014). The court further found that the ALJ's "decision neglect[ed] to mention [the claimant's] sleep apnea diagnosis even once[;]" that "the ALJ's RFC assessment contained no

11

limitations resulting from sleep apnea, pain, fatigue, insomnia, or [the claimant's] various medications[;]" and that "treatment notes" in the medical record "regarding fatigue and insomnia received no attention in the ALJ's decision." *Id.* at *5, *7. Considering these and other failures to address record evidence, the court found that "the volume of evidence not addressed in the ALJ's decision raises serious doubts about the supportability of the ALJ's RFC finding" and that remand for reconsideration was therefore required. *Id.* at *7. Similarly, in *Murry v. Colvin*, the court found that the ALJ's RFC "evaluation was deficient, as the ALJ did not discuss [the claimant's] sleep apnea, his mental health, or any limitations that might be caused by either impairment." Civ. Action No. 3:12CV-56, 2013 WL 2147944, at *4 (W.D. Ky. May 15, 2013). And, in *Fodora v. Astrue*, the court found that the ALJ's decision lacked the support of substantial record evidence because "the ALJ failed to consider all of [the claimant's] impairments in determining the RFC" and specifically "failed to incorporate [the claimant's] impairments of sleep apnea and depression." No. 10-CV-1423, 2012 WL 996768, at *2 (N.D.N.Y. Mar. 23, 2012).

The record in this case does not demonstrate the same kind of failure by the ALJ to address the effect of Frazier's sleep apnea. Instead, the administrative record shows that the ALJ considered Frazier's sleep apnea at step three (AR 32–33) and discussed record evidence regarding her sleep apnea, sleep disturbances, and fatigue in determining Frazier's RFC (AR 37).

*Goucher v. Colvin*, the last case Frazier cites, is also distinguishable on its administrative record. No. C-14-3009, 2015 WL 4051976 (N.D. Cal. July 2, 2015). In that case, the court found that the ALJ's failure to account for the claimant's sleep apnea in the RFC determination was reversible error because the record included medical evidence diagnosing the claimant with "extremely severe obstructive sleep apnea and hypertension . . . ." *Id.* at *8 (alteration in original) (citation omitted). Here, by contrast, Frazier's December 2017 medical records show a diagnosis

of "moderate obstructive sleep apnea, severe in the supine position" (AR 517), and November 2020 medical records show that Frazier's "[m]oderate obstructive sleep apnea" was "[s]table" (AR 1150).

Frazier has not shown that the ALJ's consideration of her sleep apnea in formulating her RFC warrants remand.

### 2.    Shoulder Impairment

Frazier next argues that the ALJ erred in determining that, despite her degenerative shoulder joint disease, Frazier retains the capacity to frequently reach overhead and push and pull with both arms. (Doc. No. 10.) Frazier concedes that "[t]he ALJ discussed much of the evidence in the file related to [her] treatment for her shoulders[,]" but she argues that the ALJ nevertheless erred by "conclud[ing], without any citation to evidence, that [Frazier's] shoulders have improved and she 'has not required significant ongoing treatment for her shoulder pain.'" (*Id.* at PageID# 1293 (quoting AR 38).) The Commissioner responds that the ALJ's RFC limiting Frazier to frequent overhead reaching and frequent pushing and pulling with her arms is supported by substantial record evidence because "the RFC was based on all the evidence, including medical opinions and prior administrative medical findings that considered all of [Frazier's] impairments, including" her degenerative shoulder joint disease. (Doc. No. 12, PageID# 1324.)

The ALJ considered the following evidence regarding Frazier's shoulder impairments in formulating the RFC:

> . . . The claimant complained of right shoulder pain in May 2017, and an MRI showed a small partial-thickness tear of the distal supraspinatus tendon, labral degeneration, and AC joint degenerative changes. The claimant was diagnosed with a partial rotator cuff tear with adhesive capsulitis and underwent arthroscopic release and limited debridement of the rotator cuff and a biceps tenodesis (Exhibit 7F). In August 2018, the claimant had an MRI of the left shoulder that showed a small partial thickness bursal surface tear and mild subscapularis tendinosis with mild acromioclavicular joint osteoarthritis (Exhibit 10F). In

13

November 2018, the claimant underwent left shoulder arthroscopy with labral debridement and biceps tenodesis (Exhibit 10F/8).

*     *     *

Maury Regional Prime Care notes in July 2019, and November 2019, show the claimant's history of carcinoid tumor of the appendix, GERD, hypertension, mild depression, restless leg syndrome, history of hormone replacement therapy and morbid obesity (Exhibit 12F). At that time, the claimant was noted to have no musculoskeletal pain, no significant neurologic findings, but reported having mood swings with some depression (Exhibit 12F/7, 18F).

*     *     *

The claimant was diagnosed with degenerative disc disease osteoarthritis (knees), degenerative joint disease (shoulders), degenerative disc disease (lumbar and cervical spine, mild), and obesity, which allegedly causes her to experience chronic tenderness, stiffness, and pain in her neck and lower back that radiates into her shoulders, arms, and legs causing numbness and weakness. During the relevant period, the claimant reported having pain at times, which allegedly disrupted her ability to work and perform household tasks. However, she reported only receiving minimal treatment for her alleged back pain. The claimant testified conservative to treatment modalities such as Cyclobenzaprine, Ibuprofen that improved her pain. X-rays of both the claimant's lumbar and cervical spine taken August 14, 2019, only identified mild degenerative disc disease (Testimony; Exhibits 17F; 18F; 19F; 24F). The claimant was diagnosed with degenerative disc disease, which causes diffuse back pain. However, numerous physical examinations during the relevant period indicate that the claimant was alert and in no acute distress. It should be noted, while seeking treatment for other unrelated ailments, the claimant denied back and muscle stiffness at times (Exhibit B-2F page 3).

*     *     *

The record establishes that the claimant sustained a left shoulder injury and filed a worker's compensation settlement, but reportedly received no lifetime medical coverage for the injury. The evidence shows that the claimant has had problems with both shoulders that required arthroscopic repairs that are discussed herein above. The evidence suggests that the claimant experienced improvement, and has not required significant ongoing treatment for her shoulder pain. The claimant has reported back pain at times, but has not required physical therapy. The evidence suggests that her pain has been improved with medications including Gabapentin and Meloxicam. The claimant has also complained of some neck pain and right knee pain, but has never required surgery, physical therapy and has not required injection in these joints.

Turning to opinion evidence associated with the claimant's physical impairments, by request of the Social Security Administration, the claimant presented to a

14

consultative examination on January 7, 2020, performed by James Wiesman, M.D.,
Upon examination, Dr. Wiesman reviewed radiological imaging of the claimant's
lumbar spine. Test results only showed mild degenerative disc disease. No nerve
root impingement was identified. Dr. Wiesman also noted that the claimant had a
workplace injury in 2018 involving her left shoulder, and that she underwent
surgery with a biceps tenodesis and debridement of a SLAP tear. During
examination, the claimant demonstrated a normal gait and station. She also
exhibited a full range of motion of the bilateral upper and lower extremities, and
5/5 strength in the upper and lower extremities. She successfully climbed on and
off the examination table. Dr. Wiesman formed a diagnostic impression including
degenerative dis[c] disease, cervical and lumbosacral, mild with only minimal
symptoms, and a history of left shoulder surgery (Exhibit 21F). Dr. Wiesman
opined that the claimant is able to work eight hours a day, five days a week lifting
as much as the job requires and that she can sit six to eight hours, and walk/stand
six to eight hours in eight-hour workdays. Dr. Wiesman's examination findings and
opinion are not inconsistent with the opinions of the State agency medical
consultants discussed herein below, insofar as it allows for, at least, a limited range
of light exertional work. In this connection, the relatively benign clinical
examination signs and opinion are persuasive.

In July 2020, and March 2021, State agency medical consultants Deborah Webster-
Clair, M.D., and Frank Pennington, M.D., respectively, viewed the medical
evidence and opined that the claimant retained the capacity to perform a range of
work at the light exertional level with noted limitations (Exhibits 5A, 6A). The
opinions of Dr. Webster-Clair and Dr. Pennington are generally consistent with the
evidence considered in its entirety and discussed herein, and are largely persuasive
in determining the claimant's residual functional capacity. The evidence generated
or submitted subsequently does not suggest significant worsening of the claimant's
symptoms as discussed herein.

(AR 36–39.)

Frazier argues that this analysis lacks the support of substantial record evidence because

the ALJ failed "to provide a logical bridge between the evidence and th[e] conclusion" that

Frazier's "shoulders have improved and she 'has not required significant ongoing treatment for

her shoulder pain.'" (Doc. No. 10, PageID# 1293 (quoting AR 38).) Frazier also points to evidence

that she subsequently reported shoulder pain to Wiesman, who evaluated her in January 2020, and

to chiropractor Victor Poletajev, who evaluated her in April 2021. (Doc. No. 10.) She argues that

the ALJ improperly relied on Wiesman's statement that she has a full range of motion in her upper

extremities because, while Wiseman did state that "[s]he has full range of motion of all joints of

the upper . . . extremities" (AR 1136), Frazier argues that the specific ranges of motion he noted for her left shoulder "are far below the full range of motion for a shoulder" (Doc. No. 15, PageID# 1345).

The Court finds that, considered as a whole, the ALJ's decision builds a logical bridge between the record evidence and the conclusions that Frazier's shoulder impairments improved and that she has not required significant ongoing treatment for shoulder pain. *See, e.g.*, *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (explaining that district courts "cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result'" (alteration in original) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))); *Jason B. v. Comm'r of Soc. Sec.*, Civ. Action No. 1:23-cv-244, 2023 WL 7160510, at *5 (S.D. Ohio Oct. 31, 2023) ("[T]he ALJ's opinion—read as a whole—must build a logical bridge between the evidence and the ALJ's conclusions.").

First, as the Commissioner points out, the ALJ explained that he found "[t]he opinions of Dr. Webster-Clair and Dr. Pennington . . . largely persuasive in determining [Frazier's] residual functional capacity" (AR 39), and both Webster-Clair and Pennington discussed Frazier's appointment with Dr. Jeffrey T. Adams of the Mid-Tennessee Bone and Joint Clinic on April 1, 2019 (AR 93, 139). Records from that appointment show that Frazier received a cortisone injection to treat pain in her left shoulder on March 1, 2019. (AR 558.) Frazier reported to Adams that she "occasionally" experienced left shoulder pain "reported as being 4/10" on a 10-point pain scale, that "[a]ggravating factors include reaching up[ and] reaching back," and that "[r]elieving factors include ice and heat." (*Id.*) In a section of Frazier's chart labeled "Patient Plan," Adams wrote:

> Ms. Frazier is status post left shoulder arthroscopy with biceps tenodesis and labral debridement on 11/13/18. She has continued to slowly improve. She understands

that it can take up to a full year for the shoulder to become normal again. At this point she is at MMI.[3] PPI[4] will be assessed. She will continue working with no restrictions. I will see her back as needed.

(AR 563.)

Frazier's cited evidence that she reported some shoulder pain in January 2020 and April 2021—after Adams found in April 2019 that her left shoulder "ha[d] continued to slowly improve" since surgery in November 2018 and that Frazier would "continue working with no restrictions" (AR 563)—may support an alternative conclusion that her ability to reach, push, and pull with both arms in a work setting was more limited, but other substantial evidence in the record supports the ALJ's finding that Frazier "experienced improvement, and has not required significant ongoing treatment for her shoulder pain" (AR 38). *See, e.g.*, *Blakley*, 581 F.3d at 406 (courts must defer to ALJ's findings supported by substantial evidence even when there is substantial evidence in the record supporting an opposite conclusion). Further, Frazier has not cited any authority to support her assertion that the ranges of motion Wiesman reported for her left shoulder are well below full ranges of motion for a normal shoulder joint. Even if she had, the ALJ's RFC includes more limitations on Frazier's ability to reach overhead, push, and pull than Wiesman recommended—Wiesman recommended no limitations on these abilities (AR 1137), but the ALJ's

---

[3]    "MMI" likely stands for maximum medical improvement, which "'is reached at that point where a physician believes that further treatment will not improve a claimant's condition.'" *Marathon Ashland Petroleum v. Williams*, 733 F.3d 182, 186 (6th Cir. 2013) (quoting *Marathon Ashland Petroleum v. Williams*, 384 F. App'x 476, 478 (6th Cir. 2010)).

[4]    "PPI" likely stands for "permanent partial impairment rating[.]" *Goss v. Astrue*, No. 3:08-0473, 2010 WL 4483360, at *2 (M.D. Tenn. Nov. 1, 2010), *report and recommendation adopted*, 2011 WL 247329 (M.D. Tenn. Jan. 24, 2011). The Court notes that the administrative record includes an "impairment rating" signed by Adams and dated April 4, 2019, stating that Frazier "has an eight percent (8% percent) impairment using the range of motion model, which translates to the body as a whole five percent (5%)." (AR 502.) Neither party has discussed this impairment rating.

RFC limits Frazier to only "frequent" overhead reaching, pushing, and pulling, with both arms (AR 35). "'Frequent' is a term of art in social security disability law meaning 'occurring from one-third to two-thirds of the time.'" *Lane v. Saul*, Civ. Action No. 5:19-CV-00146, 2020 WL 3549672, at *2 (W.D. Ky. June 30, 2020) (quoting SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983)). Accordingly, Frazier has not shown that the ALJ's RFC determination regarding her shoulder impairments violated SSA regulations or otherwise lacks the support of substantial record evidence.

**B.     The ALJ's Consideration of Opinion Evidence**

Frazier argues that the ALJ further erred by treating a letter from her daughter as a third-party statement even though her daughter is a registered nurse and by failing to consider the relevant regulatory factors in evaluating medical opinions from Leveck and Poletajev. (Doc. No. 10.)

**1.     The ALJ's Consideration of Frazier's Daughter's Letter**

Frazier's daughter submitted a letter in support of her mother's DIB and SSI applications that states:

> My name is Cynthia Frazier, and I am the daughter of Lisa Frazier. I, easily, could have chosen to be an accountant or business manager but chose to be a nurse to guarantee my mother had a health advocate and someone to assist her in her care needs. My mother struggles to accept her current state of health, and she tries to "push through" but cannot do day-to-day activities without assistance. In the following paragraphs, I will describe the difference from five years ago to today.
>
> Five to six years ago, my mother was what you consider independent. She worked a full-time job with occasional overtime, maintained her day-to-day schedule, cooked, cleaned the house, etc. She was continent of bowel and bladder. There was mention of occasional aches and pains in her legs, but it was manageable. She did not need assistance with much of anything. Now, let's discuss how she is today and the level of help she needs daily.
>
> In recent years, I have seen my mother's mental state alter in regards to memory and emotion. She tends to forget appointments, taking medicine, where she places things, and places she is headed. I have had to write everything down as a reminder

for her, put her medication in weekly dispenser boxes, help her find what is lost, and make sure someone accompanies her when she drives. Her memory could be related to her small vessel disease, but I'm not sure. Emotionally, her mood swings (happy, sad/tearful, mad, anxious) vary drastically daily and sometimes without reason. Involving her in shopping, group interaction, confrontation, or anything stressful causes high levels of anxiety. Sometimes I can calm her down, but she has a hard time discussing what is bothering her and why, which relates to her PTSD, depression, and anxiety. Another change for her has been her overall physical decline. Her legs and knees have gotten weaker/buckle, causing her to fall, need assistance out of the bath, and have issues closing recliner legs. She cannot walk long distances like she previously was able to. She struggles with opening sealed lids (drinks, sauces, etc.). Lifting gallon milk jugs can be difficult; she drops them at times. Her arms cannot raise above her head, which causes her to have to hyper-flex (bend forward) her neck to brush her hair causing neck pain. IBS (irritable bowel syndrome) and complications with her bladder have caused her to have incontinent episodes at times, which adds to her anxiety and embarrassment. She constantly states or looks tired, which involves nightmares associated with her PTSD, restless legs, and pain.

In regards to pain, she is unable to stand for long periods of time without taking breaks and sitting often. However, the restless legs lead to her frequently repositioning throughout the day and tossing/turning at night while trying to sleep. Because of pain in her shoulders and back, the areas are massaged, ice packs/heating pads are applied, and periods of laying down are used to alleviate symptoms some. While we manage it the best we can with her medication and alternative attempts, it does limit her capabilities.

(AR 416.)

The ALJ analyzed Frazier's daughter's letter as follows:

In August 2021, Cynthia Frazier, R.N., the claimant's daughter, provided a third-party statement type letter that was supportive of the claimant's allegations of disability (Exhibit 24E). Ms. Frazier reported that the claimant has leg/knee weakness, pain, and some episodes of incontinence at times. She stated that the claimant requires assistance in day-to-day activities such as taking bathes [*sic*], opening lids, and lifting objects. Ms. Frazier further reported that the claimant forgets appointments, and where she has placed things, and that she puts her medications in a dispenser box. Ms. Frazier also reported that her mother has mood swings and anxiety. Although Ms. Frazier is reportedly a registered nurse, which is a medically acceptable source, she was not acting as a treating source in this particular case, and her letter is more in the form of a third-party statement. As such, Ms. Frazier did not provide a function-by-function report of the claimant's limitations in vocationally relevant terms based on examination findings or a comprehensive review of the medical record. Ms. Frazier's report is not entirely consistent with the opinion evidence of record discussed herein, and is not entirely persuasive in determining the claimant's residual functional capacity.

19

(AR 40.)

Frazier argues that, because her daughter is a registered nurse, this "letter qualifies as evidence from a medical source under 20 C.F.R. § 404.1502(d) and 20 C.F.R. § 404.1513(a)(3), and the ALJ should have considered the supportability and consistency of the opinion [under 20 C.F.R. §§ 404.1520c and 416.920c] as part of his decision." (Doc. No. 10, PageID# 1294–95.) The Commissioner responds that, because Frazier's daughter "did not treat her mother in a formal medical setting" and instead wrote the letter as "an interested daughter" and "caregiver," the ALJ complied with SSA regulations and policy by treating the letter "as a nonmedical opinion despite her training as a nurse." (Doc. No. 12, PageID# 1331.) The Commissioner further argues that the ALJ correctly found that the letter did not meet the regulatory definition of a medical opinion because Frazier's daughter "'did not provide a function-by-function report of the claimant's limitations in vocationally relevant terms[.]'" (*Id.* at PageID# 1332 (quoting AR 40).) Frazier has not replied to the Commissioner's argument.

SSA regulations for claims filed on or after March 27, 2017, differentiate between medical sources and nonmedical sources for purposes of considering opinion evidence. 20 C.F.R. §§ 404.1502, 416.902. "Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law[.]" *Id.* §§ 404.1502(d), 416.902(i). "Nonmedical source means a source of evidence who is not a medical source[,]" including "[f]amily members, caregivers, friends, neighbors, employers, and clergy." *Id.* §§ 404.1502(e)(4), 416.902(j)(4). The regulations define a "medical opinion" as follows:

> (2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .

> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other

20

physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* § 404.1513(a)(2)(i)–(iv); *see also id.* § 416.913(a)(2)(i)(A)–(D). Conversely, "[e]vidence from nonmedical sources is any information or statement(s) from a nonmedical source (including [the claimant]) about any issue in [the] claim." *Id.* §§ 404.1513(a)(4), 416.913(a)(4).

The Commissioner relies on the SSA Program Operations Manual System (POMS) to argue that the ALJ properly treated Frazier's daughter as a nonmedical source. (Doc. No. 12.) The Sixth Circuit has held that, "[a]lthough the POMS is a policy and procedure manual that employees of the [SSA] use in evaluating Social Security claims and does not have the force and effect of law, it is nevertheless persuasive." *Davis v. Sec'y of Health & Hum. Servs.*, 867 F.2d 336, 340 (6th Cir. 1989); *see also Harper-Lee v. Astrue*, No. 2:11-cv-571, 2012 WL 4483007, at *6 (S.D. Ohio Sept. 27, 2012) ("[A] court can find [the POMS] 'persuasive' (as the *Davis* court did), and other courts have observed that because 'these guidelines [POMS] represent the Commissioner's interpretation of the statutory mandate, they deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute.'" (third alteration in original) (quoting *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998))). The Commissioner argues that the ALJ properly classified the letter from Frazier's daughter in compliance with POMS DI 24503.020, which instructs: "If a person who is a medical source provides evidence in his or her capacity as a friend or family member, evaluate that evidence as if from a nonmedical source."

Social Security POMS, Evaluating Evidence from Nonmedical Sources, DI 24503.02(B), https://perma.cc/B8TU-UJ38. Frazier did not respond to this argument in her reply brief. Her opening brief argues generally that "[t]he letter qualifies as evidence from a medical source . . ." (Doc. No. 10, PageID# 1294–95), but Frazier has not presented any specific argument or authority to show that the ALJ's determination that her daughter "was not acting as a treating source in this particular case" (AR 40) lacks the support of substantial record evidence or that the ALJ otherwise violated SSA regulations in treating her daughter as a nonmedical source.

While Frazier argues that the ALJ should have evaluated her daughter's letter using the five-factors the SSA applies to medical opinions under 20 C.F.R. §§ 404.1520c(c)(1)–(5) and 416.920c(c)(1)–(5), including "supportability and consistency" (Doc. No. 10, PageID# 1295), SSA regulations explain that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using" these five factors, 20 C.F.R. §§ 404.1520c(d), 416.920c(d). Frazier has not argued that the ALJ's analysis violates SSA regulations governing consideration of evidence from nonmedical sources.

Frazier also has not responded to the Commissioner's alternative argument that her daughter's letter falls "outside the scope of a medical opinion" as defined by SSA regulations because the "letter commented only on the general relationship between [Frazier's] health and her symptoms" instead of addressing the specific extent of Frazier's functional limitations in a vocational setting. (Doc. No. 12, PageID# 1332 (citing *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n.3 (6th Cir. 2009)).) Courts in this circuit typically find that general statements about a claimant's ability to meet the physical or mental demands of work activities unaccompanied by an assessment of "any *specific* limitation[s]" do not qualify as medical opinions under SSA regulations. *Graybill v. Kijakazi*, Case No. 5:20-CV-1658, 2022 WL 4483945, at *6 (N.D. Ohio

22

Sept. 27, 2022); *see also Mitchell v. Kijakazi*, No. 3:21-0408, 2022 WL 18957185, at *5 (M.D. Tenn. July 25, 2022) ("[A]n assertion about a claimant's ability to perform full time work that fails to provide any specifics as to what actual limitations the claimant is subject to does not constitute a 'medical opinion[.]'"), *report and recommendation adopted*, 2023 WL 1778334 (M.D. Tenn. Feb. 6, 2023); *Booker R. v. Comm'r of Soc. Sec. Admin.*, No. 3:22-cv-00170, 2023 WL 4247312, at *6 n.4 (S.D. Ohio June 29, 2023) (finding that physician's statement was "not a 'medical opinion' under 20 C.F.R. § 404.1513(a)(2)" because it "did not address the specific extent of [the claimant's] limitations").

Frazier therefore has not shown that the ALJ's consideration of her daughter's letter is a ground for remand.

### 2. The ALJ's Consideration of Leveck's and Poletajev's Medical Opinions

Frazier next argues that the ALJ failed to properly consider medical opinions in the record from Leveck and Poletajev. (Doc. No. 10.) The Commissioner argues that the ALJ properly considered the required regulatory factors in evaluating these opinions.[5] (Doc. No. 12.)

For DIB and SSI claims filed on or after March 27, 2017, SSA regulations provide that the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative findings, including those from [the claimant's] medical sources."[6] 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must "evaluate the

---

[5] The Commissioner does not dispute that the statements from Leveck and Poletajev qualify as medical opinions under SSA regulations. (Doc. No. 12.)

[6] This is a departure from the regulations governing claims filed before March 27, 2017, which "[g]enerally . . . g[a]ve more weight to the medical opinion of a source who ha[d] examined [the claimant] than to the medical opinion of a medical source who ha[d] not examined [the claimant]." 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Those regulations—known as the treating physician rule—specifically required an ALJ to give controlling weight to a medical opinion from the claimant's treating physician if the opinion was "well-supported by medically acceptable

persuasiveness" of all medical opinions and prior administrative medical findings based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors including, but not limited to, evidence showing that the medical source is familiar with other evidence in the record or has an understanding of the SSA's policies and evidentiary requirements. *Id.* §§ 404.1520c(a), (c)(1)–(5), 416.920c(a), (c)(1)–(5). The regulations specifically require ALJs to "articulate in [their] determination[s] or decision[s] how persuasive [they] find all of the medical opinions" in a claimant's record. *Id.* §§ 404.1520c(b), 416.920c(b).

Supportability and consistency are "[t]he most important factors" in this analysis. *Id.* §§ 404.1520c(a), 416.920c(a). In assessing supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). The SSA has promised claimants that it "will explain how [it] considered the supportability and consistency factors . . . in [its] determination or decision" and "may, but [is] not required to, explain how [it] considered the [remaining] factors . . . ."[7] *Id.* §§ 404.1520c(b)(2),

---

clinical and laboratory diagnostic techniques and [was] not inconsistent with other substantial evidence in [the] case record[.]" *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

[7] This differs from the regulations governing SSI claims filed before March 27, 2017, which promised claimants that the SSA would "always give good reasons in [its] notice of determination or decision for the weight [it] g[a]ve [the] treating source's medical opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

416.920c(b)(2). "A reviewing court 'evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion.'" *Locatelli v. Soc. Sec. Admin.*, Case No. 2:22-cv-00014, 2023 WL 4921505, at *4 (M.D. Tenn. Aug. 1, 2023) (quoting *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-CV-02261, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020)), *report and recommendation adopted sub nom. Locatelli v. Kijakazi*, 2023 WL 5538974 (M.D. Tenn. Aug. 28, 2023).

### a. Leveck's Examination and Opinion

Leveck examined Frazier on November 18, 2014, in connection with a prior benefits application. (AR 438–43.) His opinion contains the following physical examination notes, diagnoses, and assessment:

**PHYSICAL EXAMINATION:**

Vital Signs: Height 66 inches and weight 290 pounds without shoes, blood pressure 130/98, pulse 102, and respiratory rate 24. Vision without glasses, 20/50 OD, OS, and OU. She wore glasses as a child but she could not afford to replace them as she grows older.

General: Alert and in no acute distress. Moderately obese. Well kempt and gives good effort to the evaluation. She moves between the chair and the table with mild-to-moderate difficulty.

HEENT: Speech normal and hearing grossly normal. Oral inspection unremarkable. Poor dental repair.

Neck: Without jugular venous distension or thyromegaly.

Respiratory: Breath sounds are clear and equal bilaterally.

Cardiovascular: Regular rhythm without murmur or gallop.

Abdomen: Without tenderness, masses, or organomegaly.

Integument: There is a large healed scar of the right forehead at the site of the removal of her basal cell cancer. No evidence of recurrence. No ankle edema, cyanosis, or clubbing.

Neurological: Mental status and affect normal. Cranial nerves II through XII are grossly normal. Strength testing normal in her grips, wrists, elbows, ankles, and

knees. Touch sensation is normal in hands and ankles. Decreased touch sensation in the medial and lateral aspect of left ankle. Romberg testing negative.

Musculoskeletal:

Full range of motion of the cervical spine, shoulder forward elevation 110 degrees bilaterally, abduction 90 degrees bilaterally, normal internal rotation and external rotation 80 degrees right and 70 degrees left. Full range of motion of the digits of both hands with grip formation. Able to readily approximate thumb to fingers bilaterally. Full range of motion of the wrist and elbows.

Ankle dorsiflexion 10 degrees on the right and 0 degrees on the left. Full plantar flexion bilaterally. No instability of the left ankle.

Knee flexion 90 degrees on the right with moderate low back pain and burning sensation in her legs with this maneuver. Knee flexion 45 degrees on the left with low back pain and burning pain in the leg with this maneuver. No crepitus or locking in either knee.

She has mild varus deformity of both lower legs.

Hip straight leg raising caused mild low back pain on the right at 30 degrees and on the left she had moderate low back pain at 30 degrees. Hip flexion 70 degrees on the right with moderate low back pain. Hip flexion 40 degrees on the left with moderate low back and left groin pain. Adduction 10 degrees bilaterally, abduction 20 degrees bilaterally, internal rotation 10 degrees on the right and 5 degrees on the left and external rotation 20 degrees right and 10 degrees left.

Thoracolumbar spine flexion 45 degrees, extension 5 degrees, and lateral flexion 10 degrees bilaterally.

Normal station. Gait, mild to moderately antalgic due to pain in her left ankle and "really bad" burning pain in both her lower legs. She performed tandem gait with mild difficulty. She was unable to perform toe walk, was unable to perform heel walk and was moderately unsteady with this maneuver. She could stand only briefly on her extremities and was unsteady with the attempt on the right lower extremity. She could squat one-third of the way to the floor and arise without assistance.

**DIAGNOSES:**

1. Congenital rickets with pain in both lower extremities.
2. Moderate obesity.
3. Hypertension.
4. Gastroesophageal reflux disease with occasional few reflux.
5. Irritable bowel syndrome.
6. Urinary retention status post remote bladder surgery requiring self-catheterization frequently.
7. Depression.

8.   Removal of basal cell cancer from the forehead.
9.   Arthralgia of the knees of unknown etiology.
10.  History of locking suggests meniscal pathology.
11.  Arthralgia of the left ankle.

**ASSESSMENT:**

She could sit for eight hours out of eight. Fine motor function is intact. She could stand and walk for two hour out of eight with frequent breaks and lift and carry 10 lbs occasionally.

(AR 441–42.)

The ALJ's written decision includes the following analysis of Leveck's opinion:

The evidence of record includes a remote consultative examination by Terrence Leveck, M.D., [ ] conducted in November 2014. This examination report was performed over five years prior to the claimant's current alleged onset date. Accordingly, this opinion is not persuasive in determining the claimant's residual functional capacity for the relevant period at issue in the current claim (Exhibit 2F).

(AR 39.)

Frazier argues that this analysis violates SSA regulations because "the ALJ did not consider the consistency or supportability of Dr. Leveck's examination with the other evidence of record." (Doc. No. 10, PageID# 1296.) The Commissioner responds that the ALJ "reasonably explained" that Leveck's 2014 examination was not probative of Frazier's residual functional capacity because it predated her alleged disability onset date by five years. (Doc. No. 12, PageID# 1336.) The Commissioner further argues that "the ALJ need not use the magic words of 'supportability' or 'consistency' to show that he considered these factors in weighing medical opinions" and that "the ALJ's decision, when read as a whole, shows that he substantively considered the supportability and consistency factors" for all of the medical opinions in the record, including Leveck's. (*Id.* at PageID# 1336–37.) Frazier has not responded to the Commissioner's argument.

The Commissioner's argument that the ALJ reasonably rejected Leveck's opinion as irrelevant because of its age is not persuasive. *See Page v. Soc. Sec. Admin.*, Case No. 3:22-cv-

27

00239, 2023 WL 6702882, at *9 (M.D. Tenn. Aug. 2, 2023), *report and recommendation adopted*, 2023 WL 6005344 (M.D. Tenn. Sept. 15, 2023). The Sixth Circuit "do[es] not endorse the position that all evidence or medical records predating the alleged date of the onset of disability, or evidence submitted in support of an earlier proceeding, are necessarily irrelevant or automatically barred from consideration by *res judicata*." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006). Instead, courts in this circuit "recognize that evidence presented at an earlier hearing or predating the onset of disability, when evaluated *in combination with later evidence*, may help establish disability." *Id.*; *see also Shelton v. Comm'r of Soc. Sec.*, Case No. 2:18-cv-00093, 2020 WL 707586, at *9 n.3 (M.D. Tenn. Feb. 12, 2020) (quoting *DeBoard*, 211 F. App'x at 414), *report and recommendation adopted sub. nom Shelton v. Saul*, 2020 WL 1284628 (M.D. Tenn. Mar. 18, 2020); *Audra E. v. Comm'r of Soc. Sec. Admin.*, No. 2:22-cv-1815, 2023 WL 2633669, at *6 (S.D. Ohio Mar. 24, 2023) (quoting *DeBoard*, 211 F. App'x at 414). Thus, Leveck's opinion may be relevant when considered in the context of other record evidence from after Frazier's alleged onset of disability. The Court therefore finds that the ALJ failed to comply with SSA regulations that required him to articulate his analysis of the consistency and supportability of Leveck's opinion.

This procedural error, however, does not end the Court's analysis because courts in this circuit generally will excuse an ALJ's procedural error as harmless "unless it prejudices the claimant on the merits or deprives [her] of substantial rights." *Lorraine R. v. Comm'r of Soc. Sec. Admin.*, Case No. 3:20-cv-00396, 2022 WL 4232839, at *4 (S.D. Ohio Sept. 14, 2022) (citing *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009)). "[A] court's ability to excuse an ALJ's procedural error depends 'upon the nature of the regulation' with which the ALJ did not comply 'and the importance of [the] procedural safeguard' the regulation establishes." *Page*, 2023 WL 6702882, at *10 (second alteration in original) (quoting *Lorraine R.*, 2022 WL

4232839, at *4). This Court has found that an ALJ's failure to articulate their consideration of the supportability and consistency factors as required by 20 C.F.R. §§ 404.1520c and 416.920c "may be harmless when: (1) the opinion is so patently deficient that it could not be credited; (2) the opinion was actually adopted; or (3) the ALJ met the goal of these procedural safeguards, despite failing to strictly comply with the regulations." *Id.* at *11 (quoting *Musolff v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-1739, 2022 WL 1571864, at*13 (N.D. Ohio Apr. 27, 2022)).

This Court explained in *Page v. Social Security Administration*, that "[t]he third 'circumstance may take the form of an "indirect attack," when the ALJ's analysis of other opinions in the record or of the claimant's ailments calls to question the supportability of the opinion or its consistency with other evidence.'" *Id.* (first quoting *Musolff*, 2022 WL 1571864, at *13; and then citing *Burba v. Comm'r of Soc. Sec.*, Case No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio Sept. 29, 2020)). "The key question in determining whether an 'indirect attack' satisfies the spirit of the regulatory framework is whether the analysis as a whole permits the claimant and reviewing court to glean a 'clear understanding' of the reasons . . . the limitations in an opinion were not adopted." *Id.* (first quoting *Musolff*, 2022 WL 1571864, at *13; and then citing *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 WL 3056108, at *12 (W.D. Tenn. July 20, 2021)).

Reading the ALJ's decision as a whole, the Court finds that this case presents a rare circumstance where the ALJ otherwise complied with the goal of 20 C.F.R. §§ 404.1520c and 416.920c by indirectly attacking the supportability and consistency of Leveck's opinion. *See Page*, 2023 WL 6702882, at *11. The ALJ stated that Leveck's "examination report was performed over five years prior to [Frazier's] current alleged onset date" and was "not persuasive in determining [Frazier's] residual functional capacity for the relevant period at issue in the current claim." (AR 39 (citation omitted).) The ALJ also discussed the treatment and opinion evidence from within

Frazier's disability period in detail—including her shoulder surgery in 2018 and subsequent medical improvement—and explained why that evidence only supported the limitations adopted in the ALJ's RFC. (AR 36–41.) The ALJ specifically analyzed Wiesman's examination report, finding that Wiesman's opinion that Frazier could "work eight hours a day, five days a week lifting as much as the job requires and that she can sit six to eight hours, and walk/stand six to eight hours in eight-hour workdays" was "not inconsistent with the opinions of the State agency medical consultants . . . insofar as it allows for, at least, a limited range of light exertional work." (AR 39.) The ALJ therefore found that Wiesman's "relatively benign clinical examination signs and opinion are persuasive." (*Id.*) The ALJ's analysis of this evidence also demonstrates that it is inconsistent with Leveck's 2014 opinion that Frazier could only "stand and walk for two hour[s] out of eight with frequent breaks and lift and carry 10 lbs occasionally." (AR 442.)

The ALJ's analysis as a whole is therefore sufficient to provide Frazier and this Court with a clear understanding of the ALJ's reasons for discounting Leveck's opined limitations. *See Page*, 2023 WL 6702882, at *12; *Musolff*, 2022 WL 1571864, at *13–16; *Burba*, 2020 WL 5792621, at *4; *Vaughn*, 2021 WL 3056108, at *12. The ALJ's procedural error in analyzing Leveck's opinion is harmless and does not justify remand. *See Page*, 2023 WL 6702882, at *12; *Vaughn*, 2021 WL 3056108, at *12.

### b.      Poletajev's Examination and Opinion

Poletajev examined Frazier on April 18, 2021, in connection with her DIB and SSI applications. (AR 1225–39.) His written opinion contains the following examination findings, diagnoses, and prognosis:

EXAMINATION
Lisa A. Frazier is a 48-year-old , 5'0", 294-lb. female of mesomorphic build. Vitals: blood pressure was 136/88 a pulse rate of 93 bpm and respiration of 14 breaths per minute. Examination of the claimant's gait was non-lurching, non-antalgic and

ambulation was dorsal pedal. The claimant ambulates with no noticeable limp antalgia. The claimant used no support devices present at this examination.

Upon further visual examination, there is no visible scarring of the regions of complaints at this examination. The claimant was not in a stat e of distress at this examination. The claimant had noted reserved at the encounter demeanor. She was a relatively complete historian in recalling her history and her various treatments. The claimant was cooperative during the examination proceedings.

The claimant noted some discomfort with prolonged postures and driven by her daughter to the examination and able to self mount the examination table though had difficulty in going from prone to supine to sitting and standing.

Examination of head, ears and neck region revealed sclera of the eyes were white, external eye revealed no other findings. Vision was 20/20 with corrective lenses.[ ] External ear, nose and throat examination revealed unremarkable, other than some dental work. Cranial nerves tested were 1 through 12 were unremarkable except cranial nerve VIII, Weber's, which had some laterization to the right side. Examination of the chest and thoracic region revealed respiration at a 14 breaths per minute and upon auscultation no noted rates or congestion. Heart beat was strong and rhythmic. Abdominal region was protuberant. Upon palpation of the upper quadrants there was a non-enlarged liver, spleen and the abdominal region revealed essentially normal, Upon palpatory finding, both with light and deep palpation normal findings with no tenderness. Bowel sounds were present upon auscultation. Murphy's punch test to the low back was un-reactive. The remaining examination of the abdominal region was unremarkable.

Positive orthopedic tests for the bilateral shoulders were Apley's Scratch and Apprehension bilaterally.

Positive orthopedic tests for the cervical spine revealed Shoulder Depressor and O'Donohue bilaterally.

There was tenderness for the cervical spine at CS to C7 was detected upon percussion with correlated muscular hypertonicity of the paraspinal musculature was noted of the cervical spine at CS to C7 on the right.

Positive orthopedic tests for the lumbosacral spine revealed Laseque's at 15 degrees bilaterally. Straight Leg Raiser revealed 30 degrees on the left and 25 degrees on the right.

Positive orthopedic tests for the sacroiliac revealed Gaenslen's on the right.

There was spinal tenderness at L5 with correlated muscular hypertonicity was detected of the paraspinal musculature from L5 on the right and tenderness upon deep palpation of the right sacroiliac notch.

31

Neurological testing for the upper extremities yielded a decreased wrist extensor reflex at +1/+2, bilaterally. All other reflexes for the upper extremities were essentially normal at +2/+2. There was decreased sensation of the right arm including C-5 right, left C-6, C-7 as compared to the opposite side following a dermatomal pattern. Sensory examination was performed with an Aesthesiometer. Muscle strength analysis recorded a decreased Grip Strength of bilateral hands. This was tested via a calibrated dynometer. This is according to the AMA Guides 5th edition for the claimant's age grouping. Remaining strength tested of the upper extremities revealed a +5/+5 bilateral strength.

Neurological testing for the lower extremities yielded a decreased patellar reflexes at +1/+2, bilaterally. All other reflexes for the lower extremities were essentially normal at +2/+2. There was decreased sensation of the right lower extremity sensory dermatomes, at L-5, S-1 right sided following a dermatomal pattern, as compared to the opposite side. Sensory examination was performed with an Aesthesiometer. Strength testing of the lower extremities revealed a +5/+5 bilateral strength.

Vibration testing upper and lower extremity was intact.

Mensuration of the upper extremities yielded 43 cm. for the left and 40 cm. for the right upper arms and 31 cm. for the left and 32 cm. for the right lower arms.

Mensuration of the lower extremities yielded 91 cm. for the right and 93 cm. for the left leg length, Calf measurements yielded 48 cm. on the left and 47 cm. for the right.

Range of motion studies of the cervical spine revealed:

|                    | Lisa | Normal |
|--------------------|------|--------|
| Flexion            | 25   | 50     |
| Extension          | 15   | 60     |
| Lf. Lateral Flexion| 30   | 45     |
| Rt. Lateral Flexion| 20   | 45     |
| Lf. Rotation       | 35   | 80     |
| Rt. Rotation       | 30   | 80     |

Range of motion studies of the lumbar spine revealed:

|                    | Lisa | Normal |
|--------------------|------|--------|
| Flexion            | 30   | 90     |
| Extension          | 05   | 25     |
| Lf. Lateral Flexion| 15   | 25     |
| Rt. Lateral Flexion| 10   | 25     |

Range of motion studies of the left should revealed:

|  | Lisa | Normal | Comparative Right |
|---|---|---|---|
| Flexion | 85 | 180 | 100 |
| Extension | 45 | 50 | 50 |
| Abduction | 80 | 180 | 75 |
| Adduction | 40 | 50 | 45 |
| Internal Rotation | 60 | 90 | 35 |
| External Rotation | 70 | 90 | 75 |

Range of motion studies of the thoracic spine revealed:

|  | Lisa | Normal |
|---|---|---|
| Lf. Rotation | 10 | 30 |
| Rt. Rotation | 10 | 30 |
| Flexion | 30 | 60 |

Range of motion studies of the right knee revealed:

|  | Lisa | Normal | Left |
|---|---|---|---|
| Flexion | 85 | 110 | 90 |
| Flexion Contracture | +5 | 0 |  |

Normals presented are from the 5th Edition AMA Guides. The CFR tables were implemented for any ratings[.]

<u>M.I.R.</u>
Muscle strength analysis of the upper extremities revealed essentially normal at +5/+5 bilaterally. Muscle strength testing of the upper extremities grip strength utilizing a calibrated Jamar dynonometer was performed a minimum of five times revealing a bell shaped curve of the right dominant and left non-dominant hand. Grip strength was decreased for the bilateral hands, according to page 509, table 16-32 of the AMA 5th Edition Guides, for the claimant's age. Jamar dynamometer has been calibrated on a regular basis for accuracy. Left 8, 10, 11, 10, 9 kg. Right 14, 15,13, 11, 10 kg.

Muscle strength analysis of the lower extremities revealed essentially normal at +5/+5 bilaterally.

<u>S.I.R.</u>
Pain and symptoms, varying when· present are up to 75% of the day in the cervical and lumbar spine, right and left shoulder upon increased activity. Pain and symptoms when present tend to be moderate to severe in the cervical and lumbar spine and moderate to severe in the bilateral shoulders. Pain symptoms tend to restrict listed activities of daily living due to the symptomatology. On a scale of 1 to 10, the claimant rates the pain and symptoms when present for the cervical and

lumbar spines at an 8 and the right and left shoulders at a 9. The claimant is currently using prescription and over-the-counter medications on a daily basis to help manage her symptomatology. There was decreased sensation of the right arm including the C5 nerve following a prominent dermatomal pattern. Left sided decreased sensation of the C-6 and the C-7 nerve root following a dermatomal distribution. There was decreased sensation of the right lower extremity following a dermatomal pattern, of L-5 and S-1 as compared to the opposite side. Sensory examination was performed with an Aesthesiometer.

*        *        *

X-RAY AND MRI

Lumbar MRI from March 30, 2021 revealed L2-3 facet DJD is present without significant central canal or neural foraminal stenosis. L3-4 Concentric disc bulge, ligamentum flavum thickening and facet DJD are present. Disc bulge narrows the lateral recesses, left greater than right. There is mild bilateral neural foraminal stenosis. L4-5 Facet DJD is present and contributes to mild neural foraminal stenosis bilaterally. No significant central canal stenosis. LS-S1 Facet DJD is present without significant central canal or neural foraminal stenosis. IMPRESSION: Multilevel degenerative disc and facet changes are present without evidence of direct nerve root compression at any level.

Right knee MRI from March 30, 2021, Findings: The medial and lateral menisci demonstrate normal signal. No evidence of tear or displaced fragment. Very mild medial and lateral compartment cartilage loss. Moderate to severe patellofemoral compartment cartilage loss involving the medial and lateral patellar facet. Tricompartmental marginal osteophytes. The anterior and posterior cruciate ligaments are intact. The quadriceps and patellar tendons are intact. The medial and lateral collateral ligaments are intact. The popliteus tendon is intact. There is a physiologic amount of fluid in the joint. No abnormal marrow signal. Impression: Tricompartmental osteoarthritis, mild in the lateral compartments and moderate in the patellofemoral compartment. Menisci, cruciate ligaments and collateral ligaments are intact.

Lumbosacral x-rays from March 15, 2021 revealed Mild/moderate multilevel degenerative disc disease and facet arthrosis.
Hip x-rays from March 15, 2021 revealed Mild degenerative findings. Impression: No acute fracture or dislocation.

Left foot x-rays from November 26, 2019 revealed no signs of acute bony injury.

Lumbar spine MRI from August 14, 2019 revealed L2-3 Minimal broad-based disc bulge without significant stenosis. L3-4 Broad-based disc bulge with mild caudal narrowing of bilateral neural foramen. Mild spinal stenosis measuring 9 mm AP dimension. L4-5 Mild broad-based disc bulge with small posterior annular tear. Bilateral facet arthropathy and moderate bilateral neural foraminal narrowing. L5-S1 No significant disc bulge. Bilateral facet arthropathy. No significant stenosis.

34

Cervical spine from August 14, 2019 revealed C4-5 minimal broad-based disc bulge. No stenosis. C5-6 Mild broad-based disc bulge mildly effaces the anterior thecal sac with mild bilateral neural foraminal narrowing. No spinal; stenosis. C6-7 Mild broad-based disc bulge mild effacement of the intrathecal sac. Mild left neural foraminal narrowing. No spinal stenosis. Impression: Mild cervical spondylosis and degenerative disc disease. No spinal stenosis. Mild neural foraminal narrowing as above.

Cervical spine MRI from October 10, 2017 revealed C3-4 Mild broad-based disc bulge is present. This minimally effaces the anterior aspect of the thecal sac. No high-grade canal or neural foraminal compromise is present. C4-5 Minimal broad-based disc bulge is present again slightly effacing the anterior thecal sac and abutting the. cervical cord. No canal or neural foraminal compromise is present however, C5-6. Mild broad-based disc bulge is present which slightly effaces the anterior thecal sac. No high-grade canal or neural foraminal comprise. C6-7 Minimal disc bulging is present without evidence of canal or neural foraminal compromise. Impression: Mild diffuse cervical disc bulging with minimal effacement of the anterior aspect of the thecal sac but no evidence of high-grade canal or neural foraminal compromise.

Right knee x-rays from October 20, 2016 revealed IMPRESSION: mild degenerative changes. Small joint effusion. No acute bone findings identified.

DIAGNOSIS
Chronic Post Traumatic Stress Disorder, F 43.12, Major depressive disorder recurrent severe, F 33.2, GAD General Anxiety disorder F41.1, Morbid Obesity E 66.01, Elevated Liver Enzymes R 74.8, GERO Gastro esophageal reflux disorder, H/O Total Hysterectomy Hormone replacement Therapy HRT, Hypertensive Disorder, Chronic Back Pain, Lumbar Stenosis M48.061, Lumbar Degenerative disk disease, Herniated Lumbar Nucleases Pulposus, Multi level Lumbar Foraminal Narrowing, Restless Legs, RLS, Cervical Spine spondylosis and Degenerative changes with Foraminal Stenosis at C-5 thru C-7, Right Knee Tricompartmental Arthritis and moderate to severe patellofemoral compartment cartilage loss, Bilateral Shoulder Adhesive Capsulitis, Added Fibromyalgia.

PROGNOSIS AND CONCLUSION
Lisa A. Frazier was examined on April 20, 2021, in relation to her developed and chronic medical conditions. The clinical information provided is consistent with the medical conditions diagnosed and treated. The Social Security 38-CFR booklets were reviewed and utilized in relation to this independent medical examination. Examinations and ratings were performed following the required protocols. The claimant's complete medical file as obtained and presented to this examiner was reviewed, approximately 150 plus pages.

In relation to the right shoulder condition utilizing the CFR booklets, shoulder limitation of motion thereof, noting at shoulder level, the claimant would note restricted motion according to the 38-CFR Tables. This examiner noted and

documented according to the chapter, schedules of ratings and examination proceedings in relation to the extremities examined utilizing goniometric assessment multiple times as prescribed. The claimant was noted to have restricted range of motion.

In relation to the left shoulder condition utilizing the CFR booklets, shoulder limitation of motion thereof, noting at shoulder level, the claimant would note restricted motion according to the 38-CFR Tables. This examiner noted and documented according to the chapter, schedules of ratings and examination proceedings in relation to the extremities examined utilizing goniometric assessment multiple times as prescribed. The claimant was noted to have restricted range of motion.

In relation to the cervical spine condition utilizing the CFR booklets, spine limitation of motion thereof, noting restricted motion according to the 38-CFR Tables. This examiner noted and documented according to the chapter, schedules of ratings and examination proceedings in relation to the spine with MRI findings of Degenerative Arthritis, examined utilizing Inclinometric goniometric assessment multiple times as prescribed. The claimant was noted to have restricted range of motion, Down grade reflexes, mensuration deficit of the upper extremities, and decreased sensation. As stated previously there was a bilateral grip strength deficit. This is according to the 5th Edition Guides.

In relation to the Thoraco-Lumbar spine condition utilizing the CFR booklets, spine limitation of motion thereof, noting restricted motion according to the 38-CFR Tables. This examiner noted and documented according to the chapter, schedules of ratings and examination proceedings in relation to the spine with MRI findings of Degenerative Arthritis, Dextro Degenerative Lumbar spine Scoliosis, and HNP, examined utilizing Inclinometrlc goniometric assessment multiple times as prescribed. The claimant was noted to have restricted range of motion, down grade reflexes, mensuration deficit of the lower extremities, leg length deficit, and decreased sensation. As stated previous.

In relation to the right knee condition utilizing the CFR booklets, knee limitation of motion thereof, noting restricted motion according to the 38-CFR Tables. There was a Flexion Contracture of degenerative nature of +five degrees. This examiner noted and documented according to the chapter, schedules of ratings and examination proceedings in relation to the extremities examined utilizing goniometric assessment multiple times as prescribed. Comparative Left Knee Range of Motion was applied, The claimant was noted to have restricted range of motion.

The claimant has noted various medical conditions requiring medication, which she takes on a daily basis to help manage her symptomatology. The claimant has attempted various musculoskeletal treatment and has been diagnosed for her various conditions. There were no disclosed comorbidity factors disclosed to this examiner other than stated of the examined regions. As noted in the history and

with the clinical findings noted in this examination, the claimant would reveal findings appropriately documented and represented in this report.

The Claimant as per the examination findings has numerous tender points above and below the belt line as per the Rheumatology standards as well as a developed neuro Psych disorder for a diagnosis of Fibromyalgia. This is noted in the Social Security Disability manual. SSR 12-2p: Titles II and XVI: Evaluation of Fibromyalgia[.]

The claimant would be considered non employable to these findings stated and disclosed and this condition is greater than twelve months duration and well established with the claimants Primary Physician, Referred Psychiatrist, and other seen providers.

The claimant according to the AOL's would be very limited to no more lifting than a one to three times of no more than five pounds. Carrying of five pounds no more than ten feet no more than three times, Ladders and reaching over shoulder height forbidden. Any sitting or standing limited to 15 minutes and noted constant position change required.

Attached are Neck Pain Disability Index questionnaire of two pages, an Oswestry Lower Back symptom two page form, Pain Questionnaire for the shoulders 2 pages and an additional range of motion form.

These conditions are of a Poor prognosis with a static clinical posture and still requires clinical care both prescribed and non-prescribed. Symptom magnification was not noted, during this examination and the claimant's pain perception recorded was consistent with their condition. The claimant has an ongoing pre existing diagnosed and developed neuropsych component not rated with this evaluation. The claimant has completed for this examination, the Modified Zung Depression Index and the Modified Somatic Perception Questionnaire score sheet for this examination, scoring distressed depressive. The claimant would be a candidate for further psychiatric care and evaluation. She is being seen by her Psychiatrist who prescribed neuropsych medications in relation to her developed neuropsych condition.

No treatment nor was a Doctor patient relationship established and the claimant was seen only for an evaluation in relation to this claim and appropriate regions were examined. Claimant consent forms were executed.

This Independent Examination was performed in accordance with knowledge obtained not conventionally taught as core curriculum in Medical, Osteopathic, or Chiropractic schools. This is a specialty were certifications through course study and examination, culminating with successful certification as an Independent Examiner, and finally didactic experience are acquired after graduating from one's Physician specialty. This Independent Examiner as noted below has obtained the

necessary Post-Graduate training and certifications and propounds his independent examinations to the best of his ability, objectively, and according to the Guides.

(AR 1226–33.)

The ALJ analyzed Poletajev's opinion as follows:

Victor Poletajev, D.C., a chiropractor, provided an examination report of the claimant in April 2021 (Exhibit 27F). The chiropractor reported that the claimant had lumbar disc disease, cervical spine spondylosis, restless leg syndrome, right knee arthritis, bilateral shoulder adhesive capsulitis, Fibromyalgia, and that she had some decreased grip strength, and decreased ranges of motion in her back, knees, and shoulders. The chiropractor suggested that the claimant could lift five pounds no more than one to three times, could carry five pounds no more than ten feet and only three times, and could only sit for fifteen minutes, requiring constant position changes. As a threshold matter, chiropractors are not "acceptable medical sources" under the Social Security Act for authoritative independent opinions relating to diagnoses and limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licensed physicians, psychiatrists, and psychologist. 20 CFR 404.1513 and 416.923. In this particular case, the chiropractor's suggested limitations appear to be extreme and are inconsistent with the opinion of medically acceptable sources that examined the claimant, and viewed the evidence of record as discussed herein (Exs. 21F, 2A, 6A). For example, the chiropractor suggested that the claimant has moderate to severe limitations in grasping and in standing, sitting, and walking. However, Dr. Wiesman observed a normal gait, 5/5 strength in all motor groups in the upper and lower extremities, and did not observe problems with the claimant's grip strength. Dr. Pennington viewed the medical evidence in March 2021, and did not find any significant limitations involving the claimant's grip strength, and found that the claimant could lift up to 20 pounds occasionally, and up to 10 pounds frequently, which is more consistent with the evidence considered in its entirety. Accordingly, the opinion of Dr. Poletajev is not persuasive in determining the claimant's residual functional capacity.

(AR 40–41.)

Frazier argues that the ALJ erred in finding that Poletajev was an "other source" because "Poletajev's opinion was not just other evidence, it was other medical evidence that should have been considered as such under Section 404.1513(a)(3), and the ALJ should have discussed the supportability and consistency of the evidence" with respect to Poletajev's opinion. (Doc. No. 10, PageID# 1295.) Frazier argues that this error "was not harmless" because "Poletajev opined that

38

Ms. Frazier would be unemployable due to her condition[,]" which "can be interpreted as the doctor's opinion that she would be unable to sustain regular and consistent work and would miss 20 days per month of work." (*Id.*)

The Commissioner concedes that "the ALJ appears to have used some older language concerning 'other sources' of medical information from an older version of § 1513," but argues that "this was harmless error, because the ALJ proceeded to evaluate Dr. Poletajev's opinion based on the consistency and supportability factors as required by 20 C.F.R. § 404.1520c(b)(2) . . . ." (Doc. No. 12, PageID# 1333.)

Even if the ALJ erred procedurally in his analysis, Frazier's argument about why such an error requires remand is unsupported. Poletajev did not opine on the number of days of work that Frazier would miss per month because of her impairments. Instead, Poletajev generally opined that Frazier "would be considered non employable . . . ." (AR 1232.) Frazier acknowledges that the determination of whether or not a claimant is disabled is "reserved to the Commissioner," but she nevertheless argues that Poletajev's opinion that she "would be unemployable due to her condition" "can be interpreted as [his] opinion that she . . . would miss 20 days per month of work". (Doc. No. 10, PageID# 1295.) Frazier has not cited any authority to support her assertion, and the Court is not aware of any. And the fact that Poletajev's opinion "can be interpreted" in the way Frazier proposes does not direct the conclusion that the ALJ's interpretation and ultimate disability determination lack the support of substantial record evidence. Frazier therefore has not shown that the ALJ's consideration of Poletajev's opinion is a basis for remand.

## C.     The ALJ's Consideration of Frazier's Disabling Symptoms

Frazier also argues that the ALJ did not fully explain his consideration of Frazier's reported activities of daily living in analyzing her testimony about her disabling symptoms. (Doc. No. 10.)

SSA regulations require an ALJ determining disability to "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). A two-step evaluation process governs this analysis. SSR 16-3p, 2016 WL 1119029, at *2–4 (Mar. 16, 2016). First, the ALJ determines "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms . . . ." *Id.* at 2; 20 C.F.R. §§ 404.1529(b), 416.929(b). If the ALJ finds that such an impairment exists, he must then "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *2; 20 C.F.R. §§ 404.1529(c), 416.929(c). Regulatory factors relevant to evaluating the intensity, persistence, and limiting effects of an individual's symptoms include daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; any measures used to relieve the symptoms; and other factors concerning the claimant's functional limitations and restrictions due to those symptoms. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c)(3)(i)–(vii), 416.929(c)(3)(i)–(vii).

Here, the ALJ began his analysis of Frazier's subjective complaints by articulating the relevant two-part standard for assessing a claimant's symptoms. (AR 36.) The ALJ then reviewed Frazier's diagnosed impairments, thoroughly summarized her medical records from 2016 to 2021, and specifically noted her reports of pain and any treatments or medications she received for her pain. (AR 36–38.) The ALJ acknowledged Frazier's testimony that her physical "impairments allegedly cause her to experience back pain, joint pain, nervousness, depression, irritability,

sadness, low energy and motivation levels, and isolation tendencies" and that her mental "impairments cause her to experience nervousness, irritability, sadness, low energy and motivation levels, sleep disturbances, and isolation tendencies." (AR 36, 39.) The ALJ found that Frazier "takes several medications which allegedly cause fatigue; [ ] stated she has trouble being in public; lives with her daughter and two and [a] half year—old granddaughter, but [she] helps with household tasks and does her own laundry . . . ." (AR 40 (citation omitted).) With respect to daily activities, the ALJ found that Frazier "reports spending most of her time resting at home" (AR 36) but nevertheless "reportedly performs numerous daily activities without significant difficulty" (AR 40.) For example, the ALJ found that Frazier "reportedly independently attends to personal care needs, prepares simple meals, shops in stores, drives, reads, checks her email, and watches television shows[.]" (AR 41.) Earlier in his opinion, the ALJ found that Frazier "reportedly interacts with family members, friends, and neighbors, drives in public and shops in grocery store[s], but spends a lot of time alone . . . ." (AR 34.) The ALJ concluded that, on the whole, Frazier's "reported activities are not entirely consistent with [Frazier's] allegations of disability." (*Id.*) Specifically, the ALJ found that:

> In sum, [Frazier's] allegations regarding the nature and severity of [her] impairment-related symptoms and functional limitations are partially consistent with the evidence for the relevant period in question. While the medical and other evidence of record supports some of the allegations regarding these symptoms, the alleged severity and associated functional restrictions are not well supported. The undersigned has carefully read and considered all the evidence of record and finds the residual functional capacity set forth above is more consistent with the appropriate medical findings and the overall evidence of record than the allegations made by the claimant.

(*Id.*)

Frazier argues that the ALJ's analysis of her subjective complaints lacks the support of substantial record evidence because "[t]he ALJ made no effort . . . to explain how [her] activities were not consistent with her allegations of disability." (Doc. No. 10, PageID# 1297; *see also* Doc.

No. 15, PageID# 1348 ("[T]here is absolutely no discussion as to how the activities [the ALJ] mentioned are 'not entirely consistent' with [Frazier's] allegations of disability.").) But, considering the record evidence as a whole, Frazier has not shown that the ALJ applied the incorrect legal standard in evaluating her alleged symptoms or that the ALJ's findings lack the support of substantial record evidence.

The only authority Frazier cites to support her argument is the Sixth Circuit's opinion in *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 248 (6th Cir. 2007), a case that is factually and legally distinguishable. (Doc. No. 10.) Frazier cites *Rogers* in support of her assertion that "[t]he Sixth Circuit has previously noted that a claimant's ability to do minimal daily functions around the house is not helpful in considering the claimant's ability to do comparable work activities[,]" particularly when an ALJ does not "take into account the claimant's testimony or examine how the physical effects of her disability affected her performance of such activities." (*Id.* at PageID# 1297–98.) But the court's opinion in *Rogers* was grounded in a finding that Rogers's primary disabling condition of fibromyalgia "can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. Thus, the court found, because "subjective pain complaints play an important role in the diagnosis and treatment of [fibromyalgia]," it is "particularly important" that ALJs "provid[e] justification for discounting a claimant's statements" about their disabling symptoms when assessing the effects of that condition. *Id.* at 248. Frazier's impairments, by contrast, are not similarly elusive and can be evaluated through objective medical evidence. Further, Frazier has not identified in her argument what specific information that she provides in her function report materially alters the ALJ's consideration of her ability to perform daily life activities. Finally, in *Rogers*, the Sixth Circuit determined that the ALJ improperly

analyzed the claimant's symptoms under Social Security Ruling 96-2p. *Id.* at 242. The SSA superseded that ruling with Social Security Ruling 16-3p. Because she relies only on *Rogers* for her argument, Frazier has not addressed the sufficiency of the ALJ's analysis of her symptoms under the applicable SSA regulations. She has not shown that she is entitled to remand on this ground.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Frazier's motion for judgment on the administrative record (Doc. No. 10) be DENIED and that the Commissioner's final decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 5th day of February, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge